IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| JERRY QUILLIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:10-CV-037 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

In June 2008, plaintiff told a consultative examiner, "I really don't have a mental disease. My only addiction is to cold beer." [Tr. 346]. Nonetheless, plaintiff now appeals, on mental health grounds, the defendant Commissioner's denial of his claim for disability insurance benefits. For the reasons that follow, defendant's motion for summary judgment [doc. 13] will be granted, and plaintiff's motion for summary judgment [doc. 8] will be denied.

I.

*Procedural History*

Plaintiff was born in 1957. He applied for benefits in December 2006, claiming to be disabled by bipolar disorder, occasional blurred vision, a sleep disorder, numbness and arthritis in his hands, and a "very overactive bladder." [Tr. 60, 89, 103]. Plaintiff alleges a disability onset date of July 1, 2005. [Tr. 89]. His application was denied

initially and on reconsideration. He then requested a hearing, which took place before an Administrative Law Judge ("ALJ") in August 2008.

By decision dated September 10, 2008, the ALJ denied benefits. He concluded that plaintiff suffers from "alcohol abuse/dependence, early partial remission, history of brief psychotic disorder with stressors, a personality disorder, NOS[,] and borderline intellectual functioning," which are "severe" impairments but not equal, individually or in concert, to any impairment listed by the Commissioner. [Tr. 12-16].[1] Finding plaintiff's credibility to be "diminished," the ALJ further concluded that he retains the residual functional capacity ("RFC") to perform "simple, repetitive routine medium work" with no more than occasional contact with the public and no more than frequent contact with coworkers. [Tr. 16-18]. Relying on vocational expert testimony, the ALJ determined that a significant number of jobs exist in the national economy that plaintiff can perform. [Tr. 19]. Plaintiff was accordingly deemed ineligible for benefits.

Plaintiff then sought, and was denied, review by the Commissioner's Appeals Council. [Tr. 1]. The ALJ's ruling thus became the Commissioner's final decision. *See* 20 C.F.R. § 404.981. Through his timely complaint, plaintiff has properly brought his case before this court for review. *See* 42 U.S.C. § 405(g).

On appeal, plaintiff argues that the ALJ did not sufficiently credit the opinion of examining psychologist Wayne Lanthorn, who feels that psychological limitations render

---

[1] The ALJ found plaintiff to have no severe *physical* impairments, and that determination is not challenged on appeal.

plaintiff incapable of performing any full-time employment. Plaintiff further contends that his documented tendency to "downplay his mental difficulties" was not adequately taken into account by the ALJ.

## II.

## *Background*

Plaintiff worked for Eastman Chemical Company as a machinery operator from 1981 to 2003. [Tr. 104, 114]. He was allegedly fired from that job and is "quite angry about the way he [was] terminated" [Tr. 331] for "miss[ing] a lot of work" because of a "family leave" issue with his daughter. [Tr. 347]. Plaintiff further claims that he was fired in the presence of a "group of people" in a room decorated with papers which "involved devils." [Tr. 333]. However, plaintiff has elsewhere reported that he "left due to medical reasons" [Tr. 281].

Plaintiff then worked for the Home Shopping Network ("HSN") as a machinery operator from January through June 2005. [Tr. 104].[2] Although he alleges a disability onset date of July 1, 2005, plaintiff acknowledged to the Commissioner that he did not stop working in 2005 due to medical problems but rather "because I didn't like the hours I was working." [Tr. 103]. Referencing 2006 employment with HSN, plaintiff later told a medical source, "I quit" due to low pay and long hours. [Tr. 347].

---

[2] The record elsewhere indicates that plaintiff worked for HSN in 2006. [Tr. 347]. This discrepancy is not material to the court's decision.

Plaintiff testified that he is disabled by "bipolar . . . bouts of depression and anger . . . where my emotions wasn't really stable all the time." [Tr. 25]. When asked whether the depression is ongoing, plaintiff continued,

> I don't know if it's, sometime if it's just, it [sic] depression or if it's, you know, maybe stress wondering, feeling down about, well, what am I going to do with myself around here when, you know, when I've tried to get jobs and stuff and, you know, you just, they won't hire you. I mean you get in a position, you know, you think of, well, what am I going to do at my age or when your pension's dwindling down and I don't know what, there's always been a saying around here if you get fired from the Eastman it's like you're blackballed in this community. And it almost feels like that to me around here, you know, when you, when they see that you worked at Eastman 20 some years and you're, and you're not there no more . . . .
>
> . . .
>
> . . . I feel emotionally, I don't know, you're, you're just, you're, I just feel real tired and you got to push yourself to do very much at all around the house, let alone anything else.

[Tr. 27]. Regarding his purported ability to work, plaintiff similarly told a consultative examiner, "It's hard to start at the bottom when you were at the top at Eastman." [Tr. 345].

Despite testifying that he "feel[s] real tired and you got to push yourself to do very much at all," plaintiff has elsewhere represented that he "like[s] to stay busy." [Tr. 348]. He remains capable of performing all of his family's housework and cooking, mowing and performing other yard work, driving, grocery shopping, walking the family dog, fishing, going on overnight camping trips, and "mak[ing] sure that all the vehicles are running well." [Tr. 33, 116, 118-19, 137, 140, 142, 348]. Plaintiff appeared at a 2008 examination "quite tanned" due to "frequently boating and fishing." [Tr. 344]. He explained, "Me and my son

go fishing, boating and camping. I really like hanging out with my son." [Tr. 346].

From approximately 1969 through, allegedly, mid-October of 2006, plaintiff would consume from six to twelve beers per day. [Tr. 203, 212, 275]. At the administrative hearing, plaintiff testified that he continues to drink, but "hardly ever [on] consecutive days . . . ." [Tr. 32]. He characterized himself as an "occasional drinker now" with a limit of six beers in any given day. [Tr. 32].

III.

*Relevant Medical Evidence*

On November 1, 2006, plaintiff was admitted to Woodridge Hospital. The intake report of Dr. Yogesh Goswami indicates that plaintiff "reportedly was found stark naked outside this morning. He had his hand up his rectum and stated that a dog had raped him." [Tr. 269]. The police were called and plaintiff "reportedly was charged with domestic assault for kicking his wife in the head and back and aggravated assault on four officers." [Tr. 269]. Plaintiff told Dr. Goswami that he "stopped drinking a few weeks ago." [Tr. 270]. Plaintiff's alcohol plasma level was negative, but he tested positive for benzodiazepines. [Tr. 267].[3] In his November 6, 2006 discharge report, Dr. Goswami listed diagnoses of bipolar disorder and "rule out" psychosis, alcohol dependence, and delusional disorder. [Tr. 267-68].

---

[3] At the administrative hearing, obviously under oath, plaintiff denied using benzodiazepines during the November 2006 episode. [Tr. 31]. Also, although the alcohol screen was "negative," plaintiff later told a consultative examiner that he had consumed six to eight beers at the time of the incident. [Tr. 346].

Woodridge Hospital referred plaintiff to psychiatrist Nuri Yong. [Tr. 272]. Following an intake interview, Dr. Yong's initial impressions were bipolar disorder and alcohol dependence. [Tr. 275]. Plaintiff reported that he was "withdrawing from the alcohol" at the time of his admission to Woodridge. [Tr. 275].

Clinical psychologist Steven Lawhon conducted a psychological evaluation in January 2007. As grounds for his disability application, plaintiff explained, "I had to go to Woodridge back in October for some evaluations." [Tr. 280]. Plaintiff's mood appeared depressed, and Dr. Lawhon observed that he "tended to minimize his psychological symptoms during the evaluation." [Tr. 281]. Plaintiff reported that he "used to" consume six to eight beers five times per week but he denied drinking in "several months." [Tr. 281].

Dr. Lawhon diagnosed bipolar disorder and alcohol abuse in remission. [Tr. 282]. Vocationally, he predicted that plaintiff would be moderately limited in sustained concentration and persistence, and mildly to moderately limited in work adaptation. [Tr. 282].

Psychologist Rebecca Hansmann reviewed the record in March 2007. Dr. Hansmann opined that plaintiff's bipolar disorder was possibly related to substance abuse. [Tr. 291]. She further opined that the November 2006 incident was likely related to substance abuse or withdrawal. [Tr. 300]. Dr. Hansmann predicted that plaintiff would be moderately limited only in his ability to maintain attention and concentration for extended periods. [Tr. 302]. Dr. P. Jeffrey Wright reviewed the record in August 2007 and offered

6

the same opinions as Dr. Hansmann. [Tr. 313, 322, 324].[4]

Clinical psychologist Wayne Lanthorn conducted a psychological evaluation in May 2008. Plaintiff told Dr. Lanthorn that he has continued to drink beer since his Woodridge hospitalization, but only "moderately." [Tr. 333]. Plaintiff denied virtually all factual allegations concerning the November 2006 incident. [Tr. 333, 335]. He further alleged that the authorities had a "false police report." [Tr. 335].

Dr. Lanthorn's administration of the Personality Assessment Inventory ("PAI") evidenced "an apparent tendency to repress undesirable characteristics." [Tr. 336]. Dr. Lanthorn further opined that plaintiff's PAI results "may underrepresent the extended degree of any significant findings in certain areas due to [plaintiff's] tendencies to avoid negative or unpleasant aspects of himself." [Tr. 336-37].

Dr. Lanthorn also conducted intelligence testing and a mental status evaluation. He diagnosed bipolar disorder, pain disorder, borderline intellectual functioning, and "rule out" alcohol abuse/dependence. [Tr. 337]. Dr. Lanthorn opined that plaintiff

> is incapable of functioning in a 40 hour per week job on a regular basis. It is very unlikely that he could sustain gainful employment in the competitive workforce, that he could behave appropriately consistently across time with coworkers, supervisors, and the general public and it is unlikely he would be effective functioning day to day. He is having some short-term memory loss as well as problems with concentration. Mr. Quillin is very defensiveness [sic] and seems to possess very little insight into the nature of the difficulties that have plagued him for many years resulting in two psychiatric hospitalizations,

---

[4] Although it is not clear in the administrative record, the court judicially notes that Dr. Wright is a psychologist. *See* Tenn. Dep't of Health: Licensure Verification, http://www.health.state.tn.us/Licensure/default.aspx (last visited Dec. 29, 2010).

run-ins with the law, problems with his family, etc.

[Tr. 338-39]. Dr. Lanthorn further completed a "Medical Source Statement of Ability to Do Work-Related Activities (Mental)" ("RFC Assessment"). Therein, Dr. Lanthorn opined that plaintiff is markedly limited in understanding, remembering, and carrying out complex instructions; making judgments on complex work-related decisions; responding appropriately to usual work situations and changes in the work setting; and interacting appropriately with supervisors and coworkers. [Tr. 340-41].

Plaintiff told Dr. Lanthorn that alcohol abuse has negatively impacted his life. [Tr. 337]. Dr. Lanthorn specifically noted that plaintiff's PAI profile "also indicate[s] that alcohol-related problems are likely which include difficulties with interpersonal relationships, difficulties on the job, and possible health complications." [Tr. 337]. Further, Dr. Lanthorn observed that plaintiff "has had a long standing [sic] history of alcohol abuse/dependence which has caused significant problems in his family [and] legally . . . ." [Tr. 338]. Nonetheless, in his RFC Assessment, Dr. Lanthorn opined that alcohol dependence does *not* contribute to *any* predicted vocational impairment. [Tr. 341-42].

Lastly, Senior Psychological Examiner Elizabeth Jones performed a mental status examination, with intelligence and personality testing, in June 2008. Plaintiff was "extremely" cooperative, motivated, persistent, and friendly. [Tr. 344, 347]. He "report[ed] a history of alcohol use" but claimed, "I don't really feel I was dependent, but it has caused me problems. . . . I know my vulnerabilities." [Tr. 346]. According to plaintiff, his most

recent consumption was two weeks prior to the evaluation at which time he drank "only a 6-pack." [Tr. 346]. In apparent contradiction to what he told Dr. Lanthorn [Tr. 333], plaintiff claimed to have abstained for seven months following the Woodridge hospitalization. [Tr. 346]. Plaintiff further stated, "Last summer, I had a weak moment. I drank maybe 6 or 7 times in 7 months." [Tr. 346]. Tellingly, plaintiff continued, "I really don't have a mental disease. My only addiction is to cold beer." [Tr. 346].

As did Drs. Lanthorn and Lawhon, Ms. Jones opined that plaintiff "is concerned with making a good impression and is reluctant to disclose much about his personal adjustment." [Tr. 350]. Ms. Jones diagnosed alcohol dependence in early partial remission, along with a personality disorder. [Tr. 351-52]. In an RFC Assessment, she predicted that plaintiff has no more than "moderate" vocational limitations in the areas of interacting with the public, supervisors, and coworkers. [Tr. 353-54]. Ms. Jones further opined, "Due to a history of alcohol dependence, [plaintiff] would likely need assistance in managing his finances effectively." [Tr. 349].

IV.

*Applicable Legal Standards*

Review of the Commissioner's decision is confined to whether the ALJ applied the correct legal standards and whether his factual findings were supported by substantial evidence. 42 U.S.C. § 405(g)*; Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept

9

as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971)

(quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The "substantiality of

evidence must take into account whatever in the record fairly detracts from its weight."

*Beavers v. Sec'y of Health, Educ. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) (quoting

*Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488 (1951)). In reviewing administrative

decisions, the court must take care not to "abdicate [its] conventional judicial function,"

despite the narrow scope of review. *Universal Camera*, 340 U.S. at 490.

A claimant is entitled to disability insurance payments if he (1) is insured for

disability insurance benefits, (2) has not attained retirement age, (3) has filed an application

for disability insurance benefits, and (4) is under a disability. 42 U.S.C. § 423(a)(1).

"Disability" is the "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than

12 months[.]" 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical
> or mental impairment or impairments are of such severity that he is not only
> unable to do his previous work but cannot, considering his age, education, and
> work experience, engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such work exists in the
> immediate area in which he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for work.

42 U.S.C. § 423 (d)(2)(A). Disability is evaluated pursuant to a five-step analysis

summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters*, 127 F.3d at 529 (citing 20 C.F.R. § 404.1520). Plaintiffs bear the burden of proof during the first four steps. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five. *Id.*

V.

*Analysis*

As an initial matter, the court notes that a reasonable factfinder could have concluded that plaintiff's ongoing alcohol consumption is a contributing factor material to his alleged disability. The ALJ repeatedly noted the impact of that conduct [Tr. 12-15, 17-18]. As cited by the ALJ, plaintiff has himself admitted that alcohol use has "caused him a lot of problems," and that consumption is ongoing. [Tr. 15, 17].

"An individual **shall not** be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C) (emphasis added). In light of plaintiff's continuing alcohol consumption and his admissions regarding its impact, this issue alone requires dismissal of the present appeal.

Turning nonetheless to the issues now presented by plaintiff, the "Argument" section of his appellate brief slightly exceeds seven pages. The first five of those pages are simply a restatement of the medical record, which plaintiff had already summarized once in the "Statement of Case" section of his brief. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed [argumentation], are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *United States v. Cole*, 359 F.3d 420, 428 n.13 (6th Cir. 2004) (citation omitted). It is not the duty of this court to formulate arguments on a claimant's behalf or to undertake an open-ended review of the entire record. *See Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006). Any unspecified or undeveloped issue in the first five pages of plaintiff's "Argument" briefing is therefore deemed waived.

Turning to the last two pages of plaintiff's briefing, it is argued that the ALJ should have given greater weight to the opinion of Dr. Lanthorn. As noted above, Dr. Lanthorn examined plaintiff and opined that he is incapable of working. Dr. Lawhon and Senior Psychological Examiner Jones examined plaintiff and reached the opposite

conclusion. Synthesizing these differing views, the ALJ ultimately ruled that plaintiff retains the RFC to perform "simple, repetitive medium work" with no more than occasional contact with the public and no more than frequent contact with coworkers.

Plaintiff argues that Dr. Lanthorn's opinions should have received greater weight because Dr. Lanthorn is more qualified than Ms. Jones and because he performed more extensive testing. Plaintiff also contends that Dr. Lanthorn discussed the medical record in greater detail, and he accuses Ms. Jones of "not even mention[ing his] prior psychiatric treatment records."

This last assertion is incorrect. In her report, Ms. Jones observes that "[r]ecords indicate that he has been diagnosed in the past with a psychotic disorder, although this appears to be more of a brief reactive psychosis related to multiple stressors." [Tr. 347]. Reviewing psychologists Hansmann and Wright also reviewed the medical record. [Tr. 300, 322]. Dr. Lanthorn therefore is not unique in this respect.

Plaintiff is correct that Dr. Lanthorn possesses a Ph.D. whereas Ms. Jones "only" has a master's degree. However, other sources who disagreed with Dr. Lanthorn (Drs. Lawhon, Hansmann, and Wright) have comparable degrees. Lastly, to the extent that plaintiff argues Dr. Lanthorn "performed extensive testing," the administrative record shows that Ms. Jones performed even more testing than did Dr. Lanthorn. [Tr. 329-30, 344].

Further, education and depth of examination are not the only factors to be considered by the Commissioner in evaluating medical opinions. *See* 20 C.F.R. §

404.1527(d).  Among the numerous other considerations is the supportability of a medical source's views.  *See* 20 C.F.R. § 404.1527(d)(3).  As noted by the ALJ [Tr. 17], Dr. Lanthorn's RFC assessment is not consistent with the record as a whole.  Of note, his views are in part based on plaintiff's prior November 2006 hospitalization. [Tr. 338-39].  As correctly noted by the ALJ [Tr. 17], numerous sources have opined that this brief episode was likely related to substance abuse.

The court additionally notes that Dr. Lanthorn's conclusions are inconsistent with his own report.  As mentioned above, Dr. Lanthorn wrote that plaintiff's PAI profile "indicate[s] that alcohol-related problems are *likely* which include difficulties with interpersonal relationships, *difficulties on the job*, and possible health complications." [Tr. 337] (emphasis added).  Dr. Lanthorn was aware that plaintiff "has had a long standing [sic] history of alcohol abuse/dependence which has caused significant problems in his family [and] legally . . . ."  [Tr. 338].  Plaintiff admitted to Dr. Lanthorn that alcohol abuse has negatively impacted his life [Tr. 337] and that he continues to drink.  [Tr. 333].  Nonetheless, in his RFC Assessment, Dr. Lanthorn opined that alcohol dependence would *not* contribute to any predicted vocational impairment.  [Tr. 341-42].

Plaintiff is correct that Dr. Lanthorn performed a mental status examination and testing.  However, it appears that Dr. Lanthorn disregarded the results of that examination and testing.  The conclusion that plaintiff's RFC is not impacted by substance abuse is inconsistent with Dr. Lanthorn's own report and is, quite plainly, incredible.  *See* 20 C.F.R.

§ 404.1527(d)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion.").

Ultimately, as is so often the case, the ALJ was faced with differing medical source opinions. He was "presented with the not uncommon situation of conflicting medical evidence. The trier of fact has the duty to resolve that conflict." *Richardson v. Perales*, 402 U.S. 389, 399 (1971). The substantial evidence standard of review "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). Plaintiff essentially argues that a different factfinder could have reached a different conclusion below, but that is not the standard of review binding this court. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

The ALJ discussed the divergent medical opinions and came to an RFC conclusion that was both sufficiently explained and supported by the record as a whole. [Tr. 17]. While plaintiff would like the ALJ's conclusions to have been more restrictive, it is worth noting that the opinions of Dr. Lawhon and Ms. Jones would have supported an even *less* restrictive RFC finding, but the ALJ gave plaintiff's allegations the "benefit of the doubt" to some extent. [Tr. 17]. On the facts of the present case, it was well within the ALJ's discretion to rely upon the strains of evidence that he found most credible.

This conclusion is not affected by plaintiff's apparent tendency to downplay negative aspects of his personality. As noted, Dr. Lanthorn opined that plaintiff might be

15

more psychologically limited than it appears due to his "tendencies to avoid negative or unpleasant aspects of himself." That view is somewhat echoed by Ms. Jones and Dr. Lawhon.

The court agrees with these examiners that plaintiff's subjective reporting is inaccurate at best. However, this point does not automatically direct the conclusion that, in some unspecified way, plaintiff is more limited than the medical sources have opined. Instead, an alternate reasonable conclusion is the one that the ALJ reached - simply that plaintiff's credibility is "diminished" as to his purported inability to work.

It is noteworthy that plaintiff at times seeks to downplay negative traits but at other times is all too willing to disclose them. For example, to Ms. Jones plaintiff "denied ever having had problems with excessive spending, stating, 'I've always been real careful with our money.'" [Tr. 348]. However, in the paperwork submitted to the Commissioner in pursuit of disability benefits, plaintiff readily claimed that his alleged mental conditions cause him to mismanage money and overspend [Tr. 144, 156], admitting, "I can't control myself. I want to help everybody that asks for help." [Tr. 120].

Other obvious inconsistencies show plaintiff's subjective reporting to be unreliable. For example, to the Commissioner he reported a brief five-month period of military service. [Tr. 90]. To Dr. Lanthorn, however, he denied having ever been in the military. [Tr. 331]. Plaintiff generally claims to have been fired by Eastman Chemical, but he told Dr. Lawhon that he "left due to medical reasons." [Tr. 281]. Similarly, but

16

conversely, plaintiff has repeatedly told the Commissioner he is unable to work, yet he admits that he quit his last job with HSN simply because he did not like the hours and pay.

Regardless of the psychological and/or behavioral reasons underlying these inconsistencies, the issue is most apparent when the subject of plaintiff's substance abuse arises. Plaintiff admitted to Dr. Yong that he consumed six to eight beers per day dating back to 1969. [Tr. 275]. However, in medical questionnaires completed between 1985 and 1994, plaintiff claimed to consume beer only once or twice per week (or even less). [Tr. 193, 196, 203, 212, 218, 224, 230, 237]. The broad impact of his alcoholism is noted even by Dr. Lanthorn, yet plaintiff continues to insist that he was never dependent on alcohol and that he "knows his vulnerabilities." Numerous other inconsistent statements on this issue have been cited in detail above.

Plaintiff's substance abuse also extends to his purported physical problems. Disability is alleged in part due to a "very overactive bladder." [Tr. 60, 131, 345]. Plaintiff contends that his bladder problems contribute to his alleged insomnia [Tr. 141, 149, 153, 159], and one does not need a medical degree to understand that lack of sleep in turn contributes to other problems reported by plaintiff such as fatigue, stress, and anger. Tellingly, plaintiff testified, "Beer seems to ignite it just like tea and coffee where I mean I, I'll go use the bathroom and five minutes later I'm ready to go again real – and I go quite a bit." [Tr. 35]. Again, "An individual **shall not** be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's

determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C) (emphasis added).

Moreover, the inconsistencies in plaintiff's self-reporting support the conclusion that he can still work despite his contrary representations to the Commissioner. Again, plaintiff has twice stated that he quit his last job (on or after his alleged disability onset date) simply because he did not like the hours and pay. [Tr. 103, 347]. Regarding other employment, plaintiff testified that he has "tried to get jobs and stuff and, you know, you just, they won't hire you. . . . [T]here's always been a saying around here if you get fired from the Eastman it's like you're blackballed in this community." [Tr. 27]. Plaintiff similarly told a consultative examiner, "It's hard to start at the bottom when you were at the top at Eastman." [Tr. 345]. Further, despite claims of disabling emotional fatigue, the ALJ correctly noted that plaintiff's "wide range of daily activities and hobbies" [including "frequent[] boating and fishing"] . . . are not consistent with an individual who is totally disabled." [Tr. 18].

To be found disabled, a claimant's "physical or mental impairment or impairments [must be] of such severity" as to prevent him from engaging in any substantial gainful work. *See* 42 U.S.C. § 423(d)(2)(A). Objectively supported impairments are what matter - not plaintiff's unhappiness regarding prior employers' personnel decisions, workshifts, and pay rates. *See id.* (explaining the irrelevance of issues such as "whether . . . work exists in the immediate area . . . , or whether a specific job vacancy exists . . . , or whether he would be hired if he applied for work.").

Weighing and synthesizing the divergent medical opinions in light of the entire administrative record, the ALJ concluded that plaintiff's alleged impairments are not of the severity required by § 423(d).  The court has considered the record as a whole and  concludes that the ALJ's findings and conclusions are supported by substantial evidence as cited herein. The Commissioner's final decision must therefore be affirmed, and an order consistent with this opinion will be entered.

ENTER:

s/ Leon Jordan
United States District Judge